In re the MARRIAGE of Kathleen Carrico and Joel Wayne CARRICO.

Upon the Petition of Kathleen Carrico, Petitioner-Appellee,

And Concerning Joel Wayne Carrico, Respondent-Appellant,

Donna Jean Carrico and Kenneth Wayne Carrico, Intervenors-Appellants,

Dora Paxton and Royal Paxton, Intervenors-Appellees.

No. 63101.

Supreme Court of Iowa.

Oct. 17, 1979.

Ronald K. Watkins, of McGrath & McGrath, Keosauqua, for respondent-appellant and intervenors-appellants.

Richard S. Bordwell, Washington, for petitioner-appellee.

Craig S. Arbuckle, Washington, for intervenors-appellees.

Timothy B. Kuiken, Fairfield, for minor child.

Considered by REYNOLDSON, C. J., and REES, HARRIS, McCORMICK and ALLBEE, JJ.

HARRIS, Justice.

This appeal, arising from a dissolution of marriage decree, involves the custody of the couple's three-year-old son. We affirm in part, reverse in part, and remand.

Joel and Kathleen Carrico were married in 1975 and set up their home in a house owned by Kathleen's parents, Royal and Dora Paxton. The child, Joey, was born February 1, 1976. The couple immediately faced domestic strife when Kathleen discovered that she had become pregnant before the marriage. Joel believed he was not the child's father. An entry in Kathleen's diary recites that she was "proud and very happy Joey belongs to Joel and not Perry as we both thought he might have before he was born . . . ." But she testified at trial that this had been written only "because Joel did have a habit of reading my diary." Because of their stormy marriage the couple soon began a lengthy relationship with the Jefferson County department of social services (the department).

In March 1976 Joey suffered a broken leg for which he was hospitalized but recovered. A child abuse report was filed, pursuant to section 232.69, The Code 1979, and Kathleen was blamed for the injury. Joel and Kathleen disagreed as to what time of the day the injury occurred. Kathleen testified Joel must have accidentally inflicted the injury in the middle of the night. Joel

testified that the child was well when he left for work in the afternoon but had been injured when he returned from work that night. In her diary for the evening Kathleen expressed considerable hostility toward the child.

A second child abuse report was filed June 6 concerning a scratch and bruise on Joey's face. Throughout this time the Paxtons assumed most of the responsibility for Joey's care, and continued to do so throughout the first 20 months of Joey's life.

Joel worked steadily until becoming disabled in July 1978. He has not worked since. Kathleen began to work in the summer of 1976 and continued to work until trial except for an interruption from November 1976 until January 1977.

During late 1976, the couple had a bitter argument over Joel's paternity and separated for a few days. In April of 1977 they separated again, this time permanently. After the final separation Kathleen stayed with Joey at an apartment the couple had recently set up in Fairfield. Joel returned to his parents' home in Stockport, Iowa. The following summer Kathleen and Joey moved to Aurora, Illinois, to live with Kathleen's brother.

In September of 1977 Kathleen and Joey were visiting in Iowa and met with Joel and a social worker to discuss Joey's custody. After the meeting Joel seized Joey and absconded with him to Stockport. The petition for dissolution was filed the following day.

Hearing to determine Joey's temporary custody was set for October 10. Custody was given to the department pursuant to stipulation. The department decided to leave Joey's custody in the home of Joel's parents, Kenneth Wayne and Donna Jean Carrico. While there Joey was attended primarily by Joel's sister Darla. Kathleen enjoyed visitation rights under the arrangement which lasted until January of 1978 when the department allowed Joey to live with her. By this time Kathleen had moved back to the home owned by her parents in Iowa.

Joey was returned to the Carricos in Stockport in May of 1978 but visited Kathleen a few weeks later and she failed to return him. There is a dispute in the record on whether or not the Paxtons cooperated with the department in its attempts to locate Kathleen at the time. This phase of the dispute ended in July when Kathleen and Joey, who had again removed to Illinois, returned once more to Iowa and a court order was promptly obtained placing Joey in a foster home.

Upon his arrival there his foster parents noticed he had what appeared to be scabies and infected blisters on his hands. They also noticed he reacted with fright to lighted cigarettes. The Paxtons testified at trial that Joey's burns were caused by a lawn mower accident. Nevertheless a third child abuse report was filed.

In addition to relating his own physical disability Joel admitted at trial that he could not at present afford to support the child. Kathleen also confessed her limited present means. Neither sought custody. The custody dispute accordingly shifted to the two sets of grandparents.

Kenneth Wayne Carrico is 59 years old and his wife is 53. Both work at jobs of long standing and assert they are physically and financially able to care for Joey. Royal Paxton is 65 and his wife 71. Mr. Paxton is semi-retired. The Paxtons are Kathleen's adoptive parents, having raised her from infancy. They express confidence they can provide for Joey. The department suggested that, among the parties, the Carricos are best able to furnish Joey a stable environment.

The trial court found that neither parent was fit to care for Joey and neither parent disputes this finding on appeal. The trial court went on to conclude that neither set of grandparents could endure the rigors of raising another child. Moreover both Joel and Kathleen were living with or in close proximity to their parents. Joel had returned to the Carrico home in Stockport after his separation from Kathleen. Kathleen had returned to the Paxtons during the fall of 1977. Accordingly the trial court

found that the presence of Kathleen and Joel in their respective parents' homes "would be tantamount to" giving them custody. The trial court therefore retained custody in the department and ordered that they, in their discretion and at an appropriate time, institute termination proceedings in accordance with the provisions of chapter 600A of the Code of Iowa, as amended, with a view to ultimate adoption of the child, Joey, by someone other than the parties to this action. Such department is also given the discretion to maintain Joey in such foster home as it deems suitable in or outside Jefferson County, Iowa, or with or without the parties' knowledge of his whereabouts.

Issues contested on appeal center on the trial court's placement of Joey's custody. Both sets of grandparents assert that Joey's best interests demand placement with them. The Paxtons also raise a due process challenge to the trial court's direction to institute termination proceedings. Kathleen joins in her parents' request of custody and also assails the trial court's refusal to allow her visitation rights.

■ I. Our review is de novo. Iowa R.App.P. 14(f)(15). Our cases are legion that custody questions are decided on the basis of the best interests of the child. All other factors such as devotion, dedication, abilities, means, and the want of these things, of all other interested parties are important because, and to the extent that, they relate to the child's best interests. See, for example, In re Marriage of Winter, 223 N.W.2d 165, 166–67 (Iowa 1974), and authorities there cited. We have often commented that precedent is of limited value in deciding custody. As we noted in In re Marriage of Melton, 256 N.W.2d 200, 205 (Iowa 1977), "[o]f course each custody case must ultimately turn on its own peculiar facts."

■ One rule which does especially bear on the determination, and which has enjoyed pre-eminent application in our custody cases, recognizes a child needs a stable and continuing environment. "[W]e have

consistently taken the position it is highly desirable the status of a child should be fixed as quickly as possible, be thereafter disturbed as little as possible, and then only for the most cogent reasons." Halstead v. Halstead, 259 Iowa 526, 531, 144 N.W.2d 861, 864 (1966); see Winter, 223 N.W.2d at 166.

■ In this case it was the Paxtons who were allowed to provide Joey's primary care until his custody was given to the department on October 10, 1977. Nevertheless the trial court rejected their claim of custody along with that of Joey's other grandparents. The Paxtons' claim was rejected largely on account of their age. Age is a factor in custody cases but the ages of the Paxtons and Carricos are not such as to disqualify them. See Halstead, 259 Iowa at 536, 144 N.W.2d at 866; Painter v. Bannister, 258 Iowa 1390, 1397, 1399, 140 N.W.2d 152, 156, 158 (1966). Yet, as hinted in Lamar v. Zimmerman, 169 N.W.2d 819, 823 (Iowa 1969), where all other factors are equal there is a distinct advantage in placement of a child with parents of child-rearing age. Of course neither set of grandparents should be disqualified by reason of modest financial resources. In Wooley v. Schoop, 234 Iowa 657, 668, 12 N.W.2d 597, 602 (1944), we said: "The best thing for any child is to be with good parents, whether they be rich or poor or whether their home be a shanty or a mansion."

■ The trial court, as we have seen, was also prompted to reject each set of grandparents because each had one of Joey's parents in or near the home. We agree this would be bad because both parents have been found unfit for custody and neither disputes the finding. Joey should also be freed from the competition for his affection by the parties. As we noted in In re McGlasson, 195 N.W.2d 116, 118 (Iowa 1972), placing a child for permanent adoption outside his family was appropriate to escape "the locus of the bickering and rivalry existing between his mother and his brother-in-law, who live only four miles apart." In summary we believe the record

clearly shows Joey "has a better opportunity to find stability and happiness [placed outside] his own volatile family." *McGlasson,* 195 N.W.2d at 118.

The trial court was right in placing Joey in the custody of the department.

■ II. Placement of Joey's custody with the department does not answer the due process challenge to that part of the trial court's decree which, with qualifications, directed the department to institute termination proceedings with a view to placing Joey for adoption. The Paxtons, and Kathleen, believe the trial court was without jurisdiction, in this dissolution proceeding, to make such an order and we agree.

We recently considered an analogous challenge to an order for protective supervision. *In re Marriage of Snyder,* 276 N.W.2d 402, 405–06 (Iowa 1979). In *Snyder* we held:

> [T]he trial court lacked jurisdiction to adjudicate whether [the child] was a "child in need of assistance" as the term is defined in section 232.2(5). The juvenile court is the exclusive forum for proceedings leading to an adjudication of such status. § 232.61(1). These proceedings have far-reaching effects on the rights of children and parents. *See* §§ 232.100–232.102. They may even serve as a prelude to termination of the parent-child relationship. *See* § 232.114. A child can be adjudicated a "child in need of assistance" only in a juvenile court action conforming with notice and hearing requirements specified in the juvenile law. *See* §§ 232.87–.103; *In re Hewitt,* 272 N.W.2d 852 (Iowa 1978).

*Snyder,* 276 N.W.2d at 406.

In fairness to the trial court we should mention that our opinion in *Snyder* was filed after the date of its ruling. Nevertheless what we said in *Snyder* is binding. And, after stating the analogous holding just quoted, we went on to say:

> When a basis appears for believing judicial proceedings should be initiated to determine whether a child is in need of assistance, it is appropriate for the court to refer the matter to an agency or person with authority to initiate those proceedings. *See* § 232.87.

*Snyder,* 276 N.W.2d at 406.

The same is true where, as in this case, a termination proceeding is contemplated under section 232.111(1). The trial court was without jurisdiction to bring termination proceedings under chapter 600A, and similarly, lacked jurisdiction to direct that they be brought. We do not wish to be understood as suggesting termination proceedings for Joey would be inappropriate. We merely hold that they cannot be brought or ordered by the trial court in a dissolution case.

We therefore direct the trial court to modify its decree to delete the direction regarding termination.

■ III. In view of our holding it is inappropriate to consider the challenges to the trial court's refusal to grant visitation rights. The appropriateness of visitation rights might depend on whether the department elects to bring termination proceedings in juvenile court and the effect of visitations on Joey. We accordingly direct that the trial court's decree be further modified to accord the department the discretion to allow or not to allow visitation, subject to review by the trial court. *See* § 598.21.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.