**IN THE COURT OF APPEALS OF IOWA**

No. 18-0767
Filed October 10, 2018

**IN THE INTEREST OF T.B. and M.M.,**
**Minor Children,**

**M.U., Mother,**
　　　Appellant.
_____

　　　Appeal from the Iowa District Court for Washington County, Daniel P. Kitchen, District Associate Judge.

　　　The mother appeals the continued removal of two of her children from her care following the modification of a dispositional order. **AFFIRMED.**

　　　John G. Daufeldt of Daufeldt Law Firm, PLC, Conroy, for appellant mother.

　　　Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

　　　Kathryn J. Salazar of Schlegel & Salazar, LLP, Washington, guardian ad litem for minor children.

　　　Considered by Potterfield, P.J., and Bower and McDonald, JJ.

**POTTERFIELD, Presiding Judge.**

The mother challenges the continued removal of two of her children from her care following the modification of a dispositional order. The mother maintains the State (1) failed to prove by substantial evidence that imminent risk, which warranted emergency removal of the children from her care, existed and (2) did not prove a material and substantial change in circumstances warranting a change in disposition.

**I. Background Facts and Proceedings.**

T.B. and M.M. are the mother's youngest two children; they are the only children at issue in this appeal.[1] T.B. was born in September 2013 and M.M. was born in March 2017.

The mother has a history of involvement with the Iowa Department of Human Services (DHS) due to her struggles with substance abuse—specifically methamphetamine. The family was the subject of a child-in-need-of-assistance (CINA) proceeding before DHS got involved with the family this time.

DHS's current involvement with the family began in October 2016 due to allegations the mother was caring for the children while using methamphetamine. During an assessment by DHS, the mother admitted she relapsed on methamphetamine in December 2015 and stated she used it daily until

---

[1] The mother's other three children are E.U., Z.Y., and C.Y., who were born in 2006, 2007, and 2010, respectively. Z.Y. and C.Y. share a biological father; they were placed in his care in February 2017. The next month, E.U. was also placed there. The three children have remained there throughout the pendency of this case and have also been placed in the father's custody.

approximately one and a half months before the assessment. The mother was pregnant with M.M. at the time.

The mother stipulated to the January 2017 adjudication of T.B., and, following a contested hearing, M.M. was adjudicated in May. Both children were adjudicated pursuant to Iowa Code section 232.2(6)(n) (2017).

Dispositional orders have been modified a number of times throughout the case, as the mother alternates between sobriety and relapsing. The mother tested positive for methamphetamine in both January and April 2017. Additionally, she incurred a number of criminal charges and has, at times, shown a lack of stability.

However, by late August and into September, the mother was exhibiting positive progress, and both T.B. and M.M. were returned to the mother's home on extended trial visits. They were returned to the mother's custody in early November. During this time period, the mother received a number of positive reports about her ability to parent the children on her own, as her paramour, M.M.'s biological father, was not helping financially or with caretaking duties. The paramour had not engaged with the services of DHS, and the mother reported he was using methamphetamine and spending time with people who manufacture the drug. The mother reported feeling stressed about financial matters and the state of her relationship with her paramour.

In late November, the mother's substance-abuse counselor contacted DHS, reporting the mother was asked to provide a urine sample for a drug test while at a group meeting, but the mother stated she was unable. She was then asked to return the next day to provide the sample and failed to do so. When the counselor

tried to reach out to the mother, she was unable to contact her; the mother did not attend the group session the next week.

In response to the reports, DHS asked the mother to provide a sample for drug testing, and she complied. However, the results of the test—while negative for illegal substances—showed that the specimen was not within the normal range of temperatures, casting doubt as to the authenticity of the sample. Around the same time, the mother's substance-abuse counselor advised DHS that the mother would be discharged from treatment due to her lack of attendance and her failure to report for drug testing.

In its February 2018 dispositional-review order, the court continued the care and custody of T.B. and M.M. with the mother.

Then, on March 20, the State filed an application for temporary removal and a motion to modify disposition. In its motion, the State alleged the children should be placed in the care of a family member because:

> Through a DHS investigation, it was learned that [the mother's paramour] has threatened to kill the entire family; has been hitting [the mother]; and has been using methamphetamine.
> On March 18, 2018, law enforcement dealt with a high speed pursuit involving [the paramour]. [He] was believed to be on a "drug bender." He is believed to be using methamphetamine as his drug of choice. His whereabouts are unknown.
> An additional part of the DHS investigation revealed that on March 9, 2018, the mother threatened to kill herself. The mother has been using methamphetamine; has poor hygiene and teeth; and has an extremely cluttered and messy home. When law enforcement arrived at her home, she refused to give the names of her youngest two children[, T.B. and M.M.].
> The water is set to be shut-off today for the mother's home.

The court granted the application for emergency removal and placed the legal custody of both children in DHS.

A joint hearing on the matter of removal and the motion to modify disposition took place on March 26.

At the hearing, a local police officer testified that on the night of March 18, officers "engaged in a pretty lengthy vehicle pursuit" with the vehicle registered to the mother. The officers believed it was the mother's paramour who was driving the vehicle at the time; the car and driver ultimately eluded officers. When the vehicle was located a number of days later, officers found approximately three grams of a substance believed to be methamphetamine in it.

During the morning of March 20, the local officer went to the mother's home to see if she had insurance on the vehicle and if she had contact with the paramour since the chase. He testified that, as a trained drug task force officer, he believed the mother had the appearance of somebody on methamphetamine. Specifically, he testified:

> So I'm also a drug recognition expert, so I have—I'm very highly trained in the signs and symptoms of drug use. [The mother] was scratching a lot when we spoke with her. Her thoughts seemed very kind of all over the place. She was angry. She spoke very rapidly, despite having a very, I guess, tired appearance about her. The house was fairly in disarray. The dishes were piled up on the sink and then—on the counters. There were a lot of just trinkets laying around. It's very typical with stimulant users. They—they can't—their attention gets divided easily so they start one thing and then move on to something else. I kind of noted stuff like that—a lot of stuff just looks like—like maybe she started to clean here but then left and started doing something over here, and just created a lot of disarray.

The officer also pointed out what he believed to be physical indicators of the mother's use, including her "poor hygiene," "very messy" hair, and "kind of pocked skin on her face."

When asked, the mother told the officer that she had not "seen [the vehicle] since she parked it in Washington[, Iowa] the day before or something" and "the last place she knew it was in Washington."

While the officer was still at the home, T.B. told him that the family was out of milk and water and she was thirsty. The officer was later able to determine that the family's water had been shut off that day.

After the officer spoke with the mother, he went to the home of the paramour's sister, Rachel, who lived near the mother. Rachel told the officer the mother and children had been with the paramour earlier in the day of March 18, as they had all attended a family birthday party together in North Liberty. Officers were later able to obtain a surveillance video from the birthday party location that appeared to corroborate Rachel's report, as a similar-looking car and the paramour, along with a woman and two girls could be seen on the video. Rachel told the officer that people living in the mother's home—which included the mother, the paramour, and the paramour's parents—were using methamphetamine. Rachel also reported T.B. had told her the paramour "wasn't allowed to come over any more if he didn't stop breaking her stuff and hitting mommy." Rachel showed the officer a text message from the paramour on March 9, which stated the mother was threatening suicide. She also told the officer that the mother had told her "several weeks prior that [the paramour] had made a threat to kill the whole family." After the officer's conversations with the mother and Rachel, he called DHS to make a report.

The DHS case manager also testified at the hearing. She testified the department's concerns with the children's safety in the home were based upon not

knowing the location of the paramour and whether he presented any risk to the mother or the children, that methamphetamine was located in a vehicle registered to the mother, and that what the mother had told DHS regarding the car was at odds with what the officer had been able to corroborate with the surveillance video, including the mother's claim that she had reported the vehicle as stolen when she had not. The case manager also expressed concern that recently, the mother had been in less communication with DHS and had lost her job. Additionally, the mother had recently decided to try to work on her relationship with the paramour, even though she had previously admitted to DHS that he used methamphetamine, and she knew he had not participated in any services to address the situation. DHS asked the court to order both children to be drug tested.

After the conclusion of the hearing, the removal of the children continued pending the results of the drugs tests on the mother and each child and the court left the record open for the results to be admitted.

The mother's drug test from March 22 returned as negative for all substances. Pursuant to court order, a hair-stat test was conducted on both T.B. and M.M. on April 3. T.B.'s test returned negative for all substances, but one-year-old M.M.'s test showed a positive result for methamphetamine.

On April 16, the court modified the dispositional order, continuing the children's placement outside the home and transferring the custody of the children to DHS. The mother appeals.[2]

---

[2] No father appeals.

**II. Standard of Review.**

We review child-in-need-of-assistance proceedings de novo. *In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014).

**III. Discussion.**

The mother maintains the State failed to prove by substantial evidence that imminent risk existed warranting emergency removal of the children from her care. *See* Iowa Code § 232.95(2)(a) (allowing the court to "[r]emove the child[ren] from home and place the child[ren] . . . in the custody of a suitable person . . . pending a final order of disposition if the court finds that substantial evidence exists to believe that removal is necessary to avoid imminent risk to the child[ren]'s life or health"). Insofar as the mother is challenging the ex parte order removing the children from her care on March 20, 2018, "this issue is moot." *In re A.M.H.*, 516 N.W.2d 867, 871 (Iowa 1994). Since the removal, the court confirmed the removal and placed the custody of the children in the department as part of its dispositional order. "Any error committed in granting the temporary ex parte order cannot now be remedied. We cannot go back in time and restore custody based on alleged errors in the initial removal order." *Id.*

We can, however, review the juvenile court's April 16 decision to modify the dispositional order, continuing the children's removal from the mother's home and placing the children in the custody of DHS. The mother maintains the State failed to prove by clear and convincing evidence a substantial and material change in circumstances occurred as a prerequisite to modification of the prior dispositional order.

Our case law provides that "modification of custody or placement requires a material change in circumstances." *In re R.F.*, 471 N.W.2d 821, 824 (Iowa 1991); *In re Leehey*, 317 N.W.2d 513, 516 (Iowa Ct. App. 1982). But our court has recently questioned whether the requirement persists after the 2004 amendment to section 232.103. *See In re M.M.*, No. 16-0548, 2016 WL 4036246, at *4–5 (Iowa Ct. App. July 27, 2016) (Potterfield, J., dissenting); *see also In re A.S.*, 17-0663, 2017 WL 2665119, at *1 n.1 (Iowa Ct. App. June 21, 2017); *In re A.J.*, No 16-1954, 2017 WL 1278366, at *3–4 (Iowa Ct. App. Apr. 5, 2017). As currently written, section 232.103(4) sets forth the grounds authorizing modification of a dispositional order, stating:

> 4. The court may modify a dispositional order, vacate and substitute a dispositional order, or terminate a dispositional order and release the child if the court finds that any of the following circumstances exist:
> a. The purposes of the order have been accomplished and the child is no longer in need of supervision, care, or treatment.
> b. The purposes of the order cannot reasonably be accomplished.
> c. The efforts made to effect the purposes of the order have been unsuccessful and other options to effect the purposes of the order are not available.
> d. The purposes of the order have been sufficiently accomplished and the continuation of supervision, care, or treatment is unjustified or unwarranted.

Here, we need not decide whether the prerequisite survived the amendment; the State proved a substantial and material change in circumstances since the previous dispositional order. Since that time, the mother lost her employment, the water to the family's home was shut off for some period of time,[3] the mother's vehicle was involved in a high-speed chase with police officers before

---

[3] By the time of the hearing, the water had been turned back on.

ultimately being located with approximately three grams of methamphetamine in it, and the mother's one-year-old child tested positive for methamphetamine. For the same reasons, paragraph (c) of section 232.103(4) is applicable here.

As the mother has not otherwise challenged the modification of the dispositional order, *see* Iowa Code § 232.102(6), and because we find the continued placement of the children outside of the mother's care and custody is in the children's best interests, *see In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014) ("As always, our fundamental concern is the child[ren]'s best interests"), we affirm.

**AFFIRMED.**